The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes. As the appealing parties have shown good ground to reconsider the evidence, the Full Commission modifies, affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner as follows:
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All stipulations contained in the Pre-Trial Agreement are incorporated herein by reference.
2. At the hearing before the Deputy Commissioner, the parties agreed to stipulate into evidence the following:
 a) That plaintiff suffered an injury by accident arising out of and in the course of her employment with defendant-employer on 12 December 1995;
 b) That defendant would be entitled to receive a credit for short term disability benefits funded by the company in the amount of $50.00 per week for a period of eight weeks and four days.
 c) Payroll records regarding plaintiff's post-injury light-duty employment (Stipulated Exhibit No. 1);
 d) Records from the North Carolina Employment Security Commission regarding plaintiff's unemployment compensation (Stipulated Exhibit No. 2); and
 e) The employer's nursing notes regarding plaintiff (Stipulated Exhibit No. 3).
 ***********
The Full Commission modifies the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. Plaintiff was a 39-year old female at the time of the hearing before the Deputy Commissioner. She worked as a mold-line inspector for defendant-employer. In this capacity, plaintiff routinely lifted and inspected rolls of materials weighing between ten and twenty pounds.
2. Plaintiff suffered a compensable injury to her back, shoulder and leg on 12 December 1995, when she was struck by a Hyster forklift.
3. Plaintiff was initially treated for her injury by Dr. William V. Fowler of McDowell Family Physicians on 12 December 1995. Dr. Fowler is the authorized primary care physician for defendant-employer. An x-ray of plaintiff's chest, right elbow and right ankle proved negative and plaintiff was diagnosed as having multiple contusions and a sprained right ankle. Dr. Fowler prescribed anti-inflammatory agents and released plaintiff to return to work on light-duty, requesting that she return to see him in one week for a follow-up visit.
4. Plaintiff returned to see Dr. Fowler on 13 December 1995 with complaints of left forearm and left thigh numbness. Because Dr. Fowler did not find anything upon physical or neurological examination to explain these new complaints, he referred plaintiff to Dr. James H. Wheeler, an orthopaedic surgeon.
5. Plaintiff was first examined by Dr. James H. Wheeler on 15 December 1995 and continued to treat with Dr. Wheeler, defendant's authorized physician for workers' compensation injuries, through 28 February 1996. During the course of Dr. Wheeler's treatment of plaintiff, he diagnosed her as suffering from multiple contusions from her workers' compensation injury including a strain of the upper back, right elbow, left upper arm and right ankle. Dr. Wheeler prescribed anti-inflammatory and pain medication, stretching exercises and work restrictions which allowed plaintiff to return to work on light-duty status as of 17 December 1995.
6. Dr. Wheeler also examined plaintiff on 22 December 1995. He noted that plaintiff was improving, with the exception of continuing pain in her left shoulder. Dr. Wheeler believed that plaintiff's condition was consistent with some generalized muscle soreness, and his recommended treatment plan remained the same. Although Dr. Wheeler maintained his release of plaintiff to return to work on light duty, he understood that plaintiff would not be returning to work until after the new year because of the company's Christmas holiday schedule.
7. Plaintiff was next examined by Dr. Wheeler on 3 January 1996. He noted some improvement, but plaintiff continued to suffer from pain in her left shoulder and general aching in her left leg. Dr. Wheeler prescribed physical therapy for plaintiff and continued her on light-duty restrictions although he increased the amount of lifting which plaintiff could perform from ten pounds to twenty five pounds. Dr. Wheeler also saw plaintiff on 17 January, 7 February, and 28 February 1996. Plaintiff's condition continued to improve and she was continued on light-duty restrictions. Dr. Wheeler was of the opinion, and the undersigned find as fact, that plaintiff was capable of performing light-duty employment consisting of sweeping and cutting excess fabric during the entirety of his treatment of plaintiff.
8. On 28 February 1996, plaintiff informed Dr. Wheeler that she was seeing Dr. Veita Bland, her family physician in Greensboro for treatment of her back and shoulder. Plaintiff informed Dr. Wheeler that an MRI had been performed although she did not have the results of the MRI. Dr. Wheeler asked plaintiff to obtain the MRI films or the MRI report and he informed plaintiff that he would be happy to go over the results of the MRI with her if she wished. Dr. Wheeler scheduled plaintiff a follow-up appointment in two weeks. During that visit, plaintiff informed Dr. Wheeler that she had not been working although Dr. Wheeler's light duty work-restrictions continued to remain in force. Dr. Wheeler did not release plaintiff from his care at that time.
9. Plaintiff provided testimony that, if believed, would indicate that plaintiff returned to see Dr. Wheeler on 13 March 1996, but that he refused to see her because she had not provided the MRI films to him. The undersigned do not find plaintiff's testimony credible, however, since Dr. Wheeler's office notes indicate that plaintiff visited his office on 13 March 1996, but that he did not speak with plaintiff. Additionally, Dr. Wheeler testified that he did not speak with plaintiff on 13 March 1996 and that he would not have instructed his office staff to deny plaintiff any treatment since there would be no reason to refuse to treat plaintiff simply because she had not provided the MRI scan. Accordingly, the undersigned find as fact that plaintiff was not refused treatment at any time by Dr. Wheeler.
10. Dr. Wheeler testified that based on his treatment of plaintiff, he would have anticipated that plaintiff would have made a full recovery from her work-related injury and that she would not suffer any permanent partial impairment. Dr. Wheeler stated that subsequent to examining plaintiff, but prior to the taking of his deposition, he reviewed medical records from Greensboro neurosurgeon, Dr. Randy O. Kritzer, which included plaintiff's MRI report, a myelogram and a post-myelogram CT scan and that he agreed that Dr. Kritzer's conclusion that there is no nerve involvement and no indication for surgery for plaintiff. Moreover, Dr. Wheeler is of the opinion, and the undersigned finds as fact, that plaintiff's disc problems, as noted on the objective testing, are pre-existing and degenerative in nature. Dr. Wheeler anticipated that the plaintiff would probably have been released from his care and to full-duty employment within two months of her last visit to him on 28 February 1996. Dr. Wheeler also testified, and the undersigned find as fact, that at all times during his treatment of plaintiff, plaintiff could perform the light-duty work made available by the employer.
11. In February 1996, plaintiff sought treatment on her own with her previous family physician, Dr. Veita Bland. Plaintiff did not inform defendant-employer that she was seeking treatment with Dr. Bland and the company never authorized plaintiff to treat with Dr. Bland. In addition to such treatment being unauthorized, plaintiff never requested approval of such treatment from the Industrial Commission. Throughout the course of plaintiff's care for her work-related injuries, Dr. Wheeler continued to remain plaintiff's authorized treating physician. Dr. Bland began restricting plaintiff from working as of 9 February 1996, although Dr. Bland noted that the reason for the excuse was "not w/c".
12. Plaintiff also sought treatment on her own from Dr. Randy O. Kritzer, a board certified neurosurgeon, in March of 1996. Such treatment by Dr. Kritzer was neither requested by plaintiff nor authorized by defendant-employer or its servicing agent. In addition to such treatment being unauthorized, plaintiff never requested approval of such treatment from the Industrial Commission. Dr. Kritzer testified that the reasons for which he treated plaintiff were for pain in the neck and left shoulder which was secondary to foraminal stenosis at C5-6. Dr. Kritzer testified, and the undersigned finds as fact, that plaintiff's stenosis is a degenerative condition and is causally unrelated to plaintiff's work-related injury of 12 December 1995. In fact, Dr. Kritzer testified that foraminal stenosis cannot occur as part of an acute process such as plaintiff's work-related injury. Additionally, Dr. Kritzer noted that plaintiff had an unremarkable central disc abnormality at C4-5 which Dr. Kritzer characterized as "virtually insignificant" and causally unrelated to plaintiff's work-related injury. Therefore, the undersigned finds as fact that Dr. Kritzer's treatment of plaintiff was unrelated to her compensable work-related injury.
13. In the course of Dr. Kritzer's care, plaintiff was examined on four occasions from 14 March 1996 to 23 May 1996, and then released from care because plaintiff was not in need of any neurosurgical intervention. Dr. Kritzer characterized plaintiff's neurological examination as being "normal" and testified that any findings as noted on the MRI, the myelogram and post-myelogram CT scan, were degenerative in nature and not related to plaintiff's work-related injury of 12 December 1995. Dr. Kritzer testified that while he was not involved in keeping plaintiff out of work, it is reasonable for plaintiff to have continued working on the light-duty status as allowed by the company and even to attempt returning to her regular job as a mold line supervisor.
14. During the time that plaintiff was restricted to light-duty employment, she worked anywhere from 16 to 40 hours per week sweeping up lint and trimming excess fabric from "rails" of car seat upholstery. Plaintiff was allowed to both sit and stand as needed and was allowed to go home on those occasions when her back and shoulder were bothering her. Full time light-duty work was available at all times for plaintiff to perform. If plaintiff was not performing these jobs, then other employees employed by defendant-employer would perform them.
15. Under defendant's personnel policies, an employee must provide the company with a note from an authorized treating physician allowing for excused absences from work or the ability to work on light-duty status. Also under the employer's personnel policies, an employee who accumulates three consecutive unexcused absences is considered to have voluntarily resigned at the end of the leave period. Thus, pursuant to company policy, during the time that plaintiff worked on light duty, she was required to provide the company with a note from the authorized treating physician to allow her to perform light-duty work. In this case, plaintiff's employment was terminated when she failed to contact the company and provide the company with a doctor's excuse for her three-day absence beginning 12 March 1996. Specifically, Dr. Bland's work restriction note dated 27 February 1996 allowed plaintiff to return to work at normal activity on 12 March 1996. Plaintiff was absent during March 12, 13 and 14 and did not contact defendant on any of these dates. On 15 March 1996, by which time plaintiff failed to provide the company with an authorized excuse allowing her to be absent from work, the company considered her to have voluntarily terminated her employment, consistent with company policy.
16. During the period of March 12, 13 and 14, 1996, defendant's personnel manager, Mr. Harry Waters, attempted to contact plaintiff by telephone at the only telephone number which plaintiff had provided the company upon submitting her application for employment. Mr. Waters attempted to reach plaintiff on numerous occasions and was only able to reach the answering machine. These unsuccessful attempts to reach plaintiff were witnessed by defendant's plant nurse, Jamie Hicks, defendant's factory manager, Todd Brandon, and defendant's supervisor, Mark Miller.
17. Plaintiff provided testimony, that if believed, would suggest that she tried to contact Sharon McClure, defendant-employer's long-time personnel assistant by leaving voice mail messages on her answering machine at work between 12 March and 15 March, 1996. The undersigned do not accept plaintiff's allegations as credible, however, since Ms. McClure testified that she routinely checks her voice mail messages, that she was at work during that period of time and that during this entire time frame there were no messages from plaintiff on her machine. Instead, Ms. McClure testified that on Saturday, 23 March 1996 she had a voice mail message on her answering machine at work requesting that she call plaintiff. Ms. McClure testified that she is certain that this call occurred on Saturday, 23 March 1996, after plaintiff's employment had terminated, because it occurred on the Saturday the company's internal termination report had been prepared. Ms. McClure testified that the company's termination report was prepared on 18 March 1996.
18. Three days after plaintiff was considered to have voluntarily resigned, plaintiff provided defendant with a work-release note from her selected family physician, Dr. Veita Bland, allowing her to be absent from work. By the time that plaintiff presented the note from Dr. Bland, she was already considered to have voluntarily resigned.
19. Plaintiff has also provided testimony, that if believed, would suggest that her supervisor, Chris Helms, informed plaintiff that she could draw unemployment benefits during the time that she was out of work for her job-related injury. The undersigned do not accept plaintiff's allegations as credible, however, since Mr. Helms testified that plaintiff's allegations are not in keeping with company policy and that he never had such a conversation with plaintiff.
20. During the entirety of plaintiff's treatment by Drs. Fowler and Wheeler and thereafter, appropriate light-duty work continued to remain available for plaintiff to perform and plaintiff's failure to return to work in a suitable light-duty position subsequent to 12 March 1996, amounts to a constructive refusal of suitable employment.
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As a result of plaintiff's compensable injury by accident of 12 December 1995, the medical treatment she received from Drs. Fowler and Wheeler was reasonably required to effect a cure, give relief, and did tend to lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-25. Plaintiff is not entitled to further medical compensation unless one of the exceptions contained in N.C. Gen. Stat. § 97-25.1 is applicable.
2. The treatment plaintiff received from Dr. Kritzer was, by his testimony, unrelated to plaintiff's compensable injury. Further, plaintiff's treatment by Dr. Bland was not authorized by the Industrial Commission, nor was the treatment necessary due to a failure by defendant to provide medical care. Accordingly, plaintiff is not eligible to receive compensation coverage under the Act for the treatment received by either Dr. Bland or Dr. Kritzer. N.C. Gen. Stat § 97-25.
3. Following treatment by her authorized physicians, plaintiff was released to return to work in a light duty capacity as of 12 December 1995. Plaintiff performed light duty work for defendant following the holiday season, working at times for less than forty hours per week. Plaintiff is entitled to temporary partial disability payments for any week in which she earned less than her average weekly wage as a result of her work-related injury from 12 December 1995 through 15 March 1996, as calculated by a Form 22 Wage Chart. N.C. Gen. Stat. § 97-30.
4. Plaintiff is not entitled to receive any temporary total disability or temporary partial disability benefits after her 15 March 1996 termination from employment due to unexcused absences unrelated to her compensable injury, since she wrongfully refused suitable light duty employment which was made available by the company. N.C. Gen. Stat. § 97-32.
5. Defendant shall receive credit for any pay provided to plaintiff during said period and also for any short term disability benefits funded by the company in the amount of $50.00 per week for a period of eight weeks and four days.
 ***********
The foregoing results in the following:
 AWARD
1. Plaintiff's claim for medical benefits as a result of her compensable injury by accident of 12 December 1995, is allowed, but limited to care rendered by authorized physicians Drs. Fowler and Wheeler. Plaintiff is not entitled to further medical compensation unless one of the exceptions contained in N.C. Gen. Stat. § 97-25.1 is applicable.
2. Defendant shall pay to plaintiff temporary partial disability compensation to be determined by the parties pursuant to a Form 22 Wage Chart for any time that she was unable to earn wages the equivalent of her average weekly wages between 12 December 1995, and 15 March 1996. Said amount shall be paid to plaintiff in a lump sum subject to an attorney fee provided below. Said amount is also subject to a credit defendant shall receive as described in paragraph five of the Conclusions of Law section of this Opinion and Award.
3. Defendant shall deduct twenty-five percent (25%) of any compensation due plaintiff in paragraph two of this Award, and send directly to plaintiff's counsel.
4. Defendant shall pay the cost of this action.
This the ______ day of March 1999.
 S/_____________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/_____________ RENEE C. RIGGSBEE COMMISSIONER
S/_____________ CHRISTOPHER SCOTT COMMISSIONER
DCS/jbd